# IN THE SUPREME COURT, STATE OF WYOMING

## 2026 WY 78

APRIL TERM, A.D. 2026

July 15, 2026

IN THE MATTER OF THE ESTATE OF
ROBERT P. DYKES, deceased:

MICHAEL L. DYKES and J.
CHRISTOPHER DYKES, as Co-Personal
Representatives of the Estate of Robert P.
Dykes, deceased,

Appellants
(Plaintiffs),                                                   S-25-0246

v.

KATYA HUTTON,

Appellee
(Defendant).

*Appeal from the District Court of Fremont County*
*The Honorable Jason M. Conder, Judge*

*Representing Appellant:*
Lucas Buckley, John P. Fritz, and Brent Rhodes, Hathaway & Kunz LLP, Cheyenne, Wyoming. Argument by Mr. Rhodes.

*Representing Appellee:*
Jason M. Tangeman, Nicholas & Tangeman, LLC, Laramie, Wyoming. Argument by Mr. Tangeman.

*Before BOOMGAARDEN, C.J., and GRAY, FENN, JAROSH, and HILL, JJ.*

NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**HILL, Justice.**

[¶1]    In another round of litigation between Katya Hutton and the Estate of Robert P. Dykes (Estate), the Estate sued Ms. Hutton claiming embezzlement/alienation concealment of funds, conversion, and asking for declaratory judgment, and accounting/restitution. During litigation, discovery disputes arose.  On the first day of trial, the Estate renewed earlier motions to compel discovery and asked for W.R.C.P. 37 sanctions.  The district court took the motion under advisement and never issued a written ruling.  The Estate appeals asserting the district court erred when it failed to grant its renewed Rule 37 motion for sanctions.  It also argues the district court clearly erred when it denied the Estate's five claims against Ms. Hutton for improperly withholding rental payments from a condominium which is part of the estate.  Finding no error, we affirm.

### ISSUES

[¶2]    The Estate raises two issues, rephrased as:

1)    Did the district court abuse its discretion by declining to grant the Estate's renewed Rule 37 motion for sanctions made prior to trial?

2)    Did the district court clearly err in finding the Estate failed to prove Ms. Hutton improperly withheld condominium rental payments?

### FACTS

[¶3]    As observed by the district court, this case represents one of many highly contentious legal matters between the parties surrounding Robert P. Dykes's death in Florida in 2022, the resulting probate of his estate in Wyoming, and an ancillary probate in Florida.[1]  Katya Hutton and Mr. Dykes were in a long-term relationship when Mr. Dykes unexpectedly died.  Mr. Dykes's last will and testament was admitted to probate in Wyoming and his sons, Michael L. Dykes and J. Christopher Dykes, were appointed co-personal representatives of his estate.  Mr. Dykes owned a penthouse hotel condominium at a Marriott Property on Singer Island in Palm Beach, Florida.  Ms. Hutton and Mr. Dykes used the condo while in Florida and attempted to rent it out part-time when away.

[¶4]    In his will, Mr. Dykes specifically bequeathed the condo to Ms. Hutton.  The will also provided Ms. Hutton was to receive a $10,000 monthly payment during the administration of the estate to maintain herself and her other home in Palm Beach Gardens. The will instructed the Estate to pay for the condo's expenses until it was distributed to Ms. Hutton.  Mr. Dykes's sole real property in Florida—the condo—was being handled in an ancillary probate in a Florida court.  As part of that ancillary probate in Florida, the

---

[1] For example, see *Hutton v. Dykes*, 2025 WY 94, 575 P.3d 334 (Wyo. 2025).

1

parties entered into an agreement, adopted by the Florida court, that the Estate would distribute the condo to Ms. Hutton as soon as reasonably possible. In the meantime, Ms. Hutton was to use her best efforts to manage the condo and generate the maximum number of rentals and provide the court and the Estate with an accounting detailing the income and expenses of the condo. The Florida court ordered the Estate to pay all expenses associated with the condo, if the condo's gross income did not cover those expenses.

[¶5] The condo has been described as a three-bedroom, high-end property with approximately 2,000 square feet of living space, and it is often referred to as the "Presidential Suite." While Mr. Dykes was alive, the condo was rented through on-line rental sites like VRBO, Airbnb, and Expedia.[2] Mr. Dykes's assistant set up the condo's rental process and the rental accounts with those on-line services. A Colorado bank account was also set up where all the condo's rental income was automatically directly deposited. Ms. Hutton had nothing to do with renting the condo or dealing with any bills while Mr. Dykes was alive. After Mr. Dykes died, Ms. Hutton had to solely manage maintaining and renting the condo. She did not change the way the condo was rented through the rental services and instead simply took over the passwords and then let the on-line process essentially "work itself." Ms. Hutton also continued having the on-line rental services automatically directly deposit all rental payments into the Colorado bank account.

[¶6] The Estate believed Ms. Hutton was not fulfilling the Florida ancillary probate agreement and sued Ms. Hutton in Wyoming in May 2023, alleging five claims: 1) liability under Wyo. Stat. Ann. § 2-7-411 for embezzlement or alienation of money before testamentary letters granted; 2) concealment of funds under Wyo. Stat. Ann. § 2-7-412 through -413; 3) conversion; 4) declaratory judgment; and 5) request for an accounting and restitution under Wyo. Stat. Ann. § 2-7-414. Those five claims revolved around the Estate's allegation that Ms. Hutton improperly used or retained estate funds by receiving unreported income from the condo. At its core, the Estate alleged that Ms. Hutton received more rental income than she reported and accounted for, denying the Estate any offset for the condo expenses it was paying.

[¶7] As had become normal in the many highly contentious legal matters between the parties, there were discovery disputes. During discovery, the Estate served Ms. Hutton with two sets of interrogatories and two sets of requests for production (RFPs). The RFPs totaled sixty-seven in number, requesting Ms. Hutton produce and provide all primary source documentation as to how she rented the condo, when she rented it, and for how much. As part of her production of documents, Ms. Hutton produced the condo rent and expenses accountings she filed in the Florida ancillary probate which she had been ordered to submit by the Florida probate court. Ms. Hutton objected to some RFPs but otherwise believed she had produced all the requested documents she had in her possession. The

---

[2] Ms. Hutton testified she set up an MSL real estate account with her real estate license but that the condo has never been rented through that account.

Estate disagreed and filed three separate motions to compel—one to inspect the condo, and two related to the RFPs—which the district court granted.

[¶8]    In the meantime, Ms. Hutton filed a motion to compel distribution of the condo and to quash the Wyoming discovery order in the Florida ancillary probate.  The Estate resisted this even though the Florida ancillary probate order required it to distribute the condo to Ms. Hutton "as soon as reasonably possible" and would have relieved the Estate of having to pay expenses associated with it.

[¶9]    In her response to the Estate's third motion to compel—but only the second one dealing with the RFPs—Ms. Hutton pointed out that she had previously produced 2,883 pages of documents and supplemented that with 284 pages more.  Ms. Hutton also provided a detailed explanation of what she did to locate documents that might be responsive to the Estate's discovery requests.  Ms. Hutton also stated in her response:

> Stated bluntly, Ms. Hutton has produced existing documents she has in her possession, custody or control that are responsive to the requested discovery, and has not withheld any existing documents.  Ms. Hutton and her counsel have made good faith (and exhausting) efforts to search for and find existing documents which may be responsive, and produced those documents (in many instances duplicative of earlier production) to comply with the Court's order.

[¶10]  The district court partially granted the Estate's third motion to compel, finding Ms. Hutton was in custody or at least control of documents responsive to RFPs 18–20 (documents related to the number of nights, compensated or otherwise, the condo was occupied) and 66 (all communication between Ms. Hutton and the Marriott).  The district court also found Ms. Hutton could produce more records responsive to RFPs 28–31, 33–36, 38, and 41 (information from rental platforms, communications, and tax documents).

[¶11]  Because the Estate sought default judgment as a sanction for Ms. Hutton's alleged violations of the discovery orders, the district court also conducted a W.R.C.P. 37 analysis.  It noted that its analysis was hindered because no evidentiary hearing had occurred.  It ultimately concluded that default judgment was unwarranted at that time, and because it had not previously warned Ms. Hutton that a failure to furnish the requested discovery could lead to such a sanction, its order now served as that warning.  Ms. Hutton was ordered to provide responses to the RFPs by 5:00 p.m. on June 27, 2025, less than three full days before trial.  Ms. Hutton produced many additional pages of responsive documents by the deadline.

[¶12]  At the beginning of the two-day bench trial, the Estate orally renewed its Rule 37 motion for sanctions, contending Ms. Hutton had still failed to provide the responses to RFPs and was in violation of the district court's discovery orders.  The Estate requested

sanctions including default judgment, but at a minimum that the court deem key facts established or that the court preclude Ms. Hutton from contesting the accuracy of the condo stay records the Estate contended she refused to disclose.

[¶13]  Once the Estate finished its initial argument for the renewed motions, the district court directly asked its counsel, "Why haven't you asked for an order to show cause?"  The district court expressed its frustration, stating "All I hear is words.  I have seen no proof.  There's been no exhibits presented.  There's no testimony."  The Estate admitted it had not moved for an order to show cause, that there was no evidentiary hearing on the disputed matters, and that "if that's what there needs to be, then we need to go forward and do that."

[¶14]  The district court then ruled:

> At this time I have the classic lawyer conundrum.  All good lawyers here, one telling me that they are not giving me everything, the other lawyer saying, I'm giving everything.
>
> No one is asking for a continuance.  We will go forward.  I will take the matter under advisement.  We'll get opening statements done.  I would note that Ms. Hutton is a witness listed by both parties.  She can be vigorously cross-examined on those topics.  We can maybe get to the bottom of it, or not, and maybe that will help me make a ruling on that.  I will not rule now.

After taking a short recess, the district court returned to the bench and asked the Estate if it wanted a continuance on any grounds, which it declined.  The district court again announced that it was taking the Estate's motion for default judgment under advisement.  It also noted again that Ms. Hutton would be vigorously cross-examined and the court could make a ruling then "if needed" but default was "an extreme remedy" at that hour.

[¶15]  The bench trial then commenced.  The Estate sought damages in the amount of at least $233,668.71, which it claimed it had paid for condo expenses.  The district court heard the sworn testimony of five witnesses, including Ms. Hutton, who was vigorously questioned by both parties, and received thirty-two exhibits into evidence.  After the trial, the district court entered its decision, finding the Estate failed to prove Ms. Hutton ever received rental income from the condo that was wrongfully withheld from the Estate or used in an inappropriate manner.  Therefore, the district court denied all five of the Estate's claims.  The court did not expressly rule on the requested Rule 37 sanctions.  The Estate timely appealed.

## ISSUE 1

**Did the district court abuse its discretion when it declined to grant the renewed Rule 37 motion?**

4

## STANDARD OF REVIEW

[¶16]   We review a district court's rulings on discovery issues, including sanctions, for an abuse of discretion. *Pellet v. Pellet*, 2022 WY 65, ¶¶ 40–42, 510 P.3d 388, 400–01 (Wyo. 2022) (citing *Herrick v. Jackson Hole Airport Bd.*, 2019 WY 118, ¶ 11, 452 P.3d 1276, 1280 (Wyo. 2019)).   "Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means exercising sound judgment with regard to what is right under the circumstances and without doing so arbitrarily or capriciously." *Williams v. Gage*, 2026 WY 30, ¶ 10, 585 P.3d 183, 187 (Wyo. 2026) (quoting *Hale v. City of Laramie*, 2025 WY 133, ¶ 19, 580 P.3d 516, 520 (Wyo. 2025)).   "A court abuses its discretion if it acts 'in a manner which exceeds the bounds of reason under the circumstances.'" *Id.*   The appellant bears the burden of demonstrating the district court abused its discretion. *Robinson v. Black*, 2025 WY 25, ¶ 6, 564 P.3d 1030, 1033 (Wyo. 2025); *Groskop as Tr. of Black Diamond Liquidating Litig. Tr. v. S&T Bank*, 2020 WY 113, ¶ 25, 471 P.3d 274, 282 (Wyo. 2020).   The question for this Court to determine on appeal is "whether the trial court could reasonably conclude as it did."   *Hutton v. Dykes*, 2025 WY 94, ¶ 16, 575 P.3d 334, 341 (Wyo. 2025) (quoting *Holloway v. Hidden Creek Outfitters, LLC*, 2025 WY 59, ¶ 30, 569 P.3d 756, 763 (Wyo. 2025)).

## DISCUSSION

[¶17]   Our jurisprudence is clear that district courts are vested with wide discretion on discovery matters. *Peterson v. Meritain Health, Inc.*, 2022 WY 54, ¶ 92, 508 P.3d 696, 723 (Wyo. 2022); *McCulloh v. Drake*, 2005 WY 18, ¶ 16, 105 P.3d 1091, 1095 (Wyo. 2005).   District courts may even deny discovery motions if the information was available from other sources. *McCulloh*, ¶ 16, 105 P.3d at 1095 (citing *Kidd v. Kidd*, 832 P.2d 566 (Wyo. 1992), *Inskeep v. Inskeep*, 752 P.2d 434 (Wyo. 1988); *Mauch v. Stanley Structures, Inc.*, 641 P.2d 1247 (Wyo. 1982)).   "Nonetheless, the court's discretion is not unlimited— reversal may be in order when the court's ruling rests on clearly untenable or unreasonable grounds." *Peterson*, ¶ 92, 508 P.3d at 723 (quoting *McCulloh*, ¶ 16, 105 P.3d at 1095).

[¶18]   Wyoming Rule of Civil Procedure 37 provides a mechanism for a party to request the court to either compel discovery under 37(a) or sanction a party who fails to comply with the court's discovery orders under 37(b)–(f). *Peterson*, ¶ 88, 508 P.3d at 721; *see* W.R.C.P. 37(a)–(f).   For Rule 37 to come into play, the party to be sanctioned must have failed to comply with the court's discovery orders.   Even then, "[t]he decision ***whether and how*** severely to sanction under Rule 37 rests securely within the district court's province." *Peterson*, ¶ 90, 508 P.3d at 723 (quoting 8B Charles A. Wright et al., *Federal Practice and Procedure* § 2284, at 444 (3d ed. 2010)) (emphasis in original).

[¶19]   The Estate argues that because Ms. Hutton did not provide all documents responsive to the RFPs, it was without the evidence it needed to pursue its claims.   More specifically,

it did not have the documents needed to support the nights Ms. Hutton actually rented the condo. The Estate specifically alleged that Ms. Hutton had not given them: 1) the requested download and account history from the on-line rental services used by her; 2) emails between Ms. Hutton and the Marriott regarding the condo rentals and reservations; and 3) and tax documents from the on-line rental services Ms. Hutton used. At the time of the Estate's renewed motion, the district court did not know, and could not determine, whether Ms. Hutton had in fact violated its latest discovery order—its order on the Estate's third motion to compel. The district court recognized it was faced with a typical discovery dispute where one party claims it wasn't given all requested discovery, and the other party claims they had in fact given them everything. For her part, Ms. Hutton strenuously asserted that she had given everything she had or could obtain to the Estate.

[¶20] The district court pointed out the Estate had not previously presented the court with a motion to show cause, and therefore no evidentiary hearing had occurred on the matter. Thus, the district court had received no evidence Ms. Hutton had violated its latest discovery order. The district court offered to let the Estate have a continuance, where presumably the Estate could then present the court with the motion to show cause, and an evidentiary hearing could have occurred where the Estate could have submitted evidence of Ms. Hutton's discovery violations. The Estate declined a continuance and instead stated it wanted to proceed with the trial.

[¶21] Under these circumstances, we find the district court did not abuse its discretion in declining to sanction Ms. Hutton under W.R.C.P. 37 at the start of trial. The Estate had not proactively taken steps to provide the information that would have allowed the court to find Ms. Hutton had violated the court's latest discovery order. The Estate also declined the court's offer of a continuance. It was reasonable for the district court to decline to grant the Estate its requested sanctions at that point.

[¶22] However, the district court stated it would take the Estate's renewed motion under advisement because additional information may come to light at the trial. The district court indicated its intent to listen to the evidence and testimony, especially the testimony of Ms. Hutton, to rule on Rule 37 sanction, "if needed." We, therefore, turn now to whether the district court abused its discretion by declining to assess a Rule 37 sanction against Ms. Hutton after hearing her testimony.

[¶23] We have observed that Rule 37 sanctions cannot be imposed for failing to produce something a party does not have and which is unavailable to her. *Gooder v. Roth*, 788 P.2d 611, 612–13 (Wyo. 1990) (citing *Farrell v. Hursh Agency, Inc.*, 713 P.2d 1174, 1180 (Wyo. 1986)); *see also Ruwart v. Wagner*, 880 P.2d 586, 593 (Wyo. 1994). Additionally, when exercising its discretion, "the district court must determine each case on its peculiar facts, and must consider all of the circumstances before it." *Hale*, ¶ 25, 580 P.3d at 521 (quoting *In re Est. of Johnson*, 2010 WY 63, ¶ 19, 231 P.3d 873, 881 (Wyo. 2010)); *see also Shepard v. State*, 720 P.2d 904, 905 (Wyo. 1986).

6

[¶24]  The Estate's main contention appeared to be that the Marriott records showed Ms. Hutton rented the condo more time than she accounted for.  It argued that on-line rental records would support these claims, but Ms. Hutton refused to produce these records.  The Estate called Ms. Hutton as a witness in their case-in-chief.  The Estate confirmed with Ms. Hutton that she had attempted to rent the condo to paying guests since December 2022, and that she had given it a few of those reservations.  Ms. Hutton replied she had given them **everything**, i.e. all reservation documents.  On redirect examination, Ms. Hutton testified that she produced for the Estate every reservation made since Mr. Dykes died.

[¶25]  The Estate questioned Ms. Hutton about whether she sent emails to Marriott every time someone wanted to reserve her condo, including reservations booked through the on-line rental services.  Ms. Hutton testified that emails were only one of the ways she used to let Marriott know the condo was being reserved.  She testified the other ways she used was to make phone calls to Marriott or personally stop by the front desk and notify them.

[¶26]  The Estate questioned Ms. Hutton about the on-line rental services she used to rent the condo.  The Estate specifically asked Ms. Hutton about a requested download and account history from the on-line rental services it had requested she provide:

> Q: My question is, when I asked for an account download of the online resources, what did you do to try to get that?
>
> A: Downloaded everything I can and provided some correspondence.  Everything I could.  Expedia was cancelled, I really couldn't do that.
>
> Q: When did you do that?
>
> A: I did it in March.
>
> . . . .
>
> Q: My question is not about the tax returns.  It's about account downloads.  Before March, what did you do to try to get the account downloads?
>
> A: I did everything I was asked for.
>
> Q: Prior to March, what did you do?
>
> A: I downloaded everything, and then I submitted—for the latest court order, I submitted everything from March to June.

The Estate then showed Ms. Hutton Exhibit 545, VRBO deposits, and asked her what it was, and she replied it was an accounting from the website that was requested and she produced to them. Ms. Hutton affirmed that Exhibit 545 was an accurate reflection of the deposits she received from VRBO while renting the condo from June 2022 to January 2024. Ms. Hutton confirmed on cross-examination by her own counsel that the list included all the VRBO rentals.

[¶27] The Estate showed Ms. Hutton Exhibits 16A and 31, Marriott Guest History Reports, as well as Exhibit 42, a recent VRBO accounting, and Exhibit 545 to cross-check names, presumably to try to impeach her. However, it was not clear if the Estate was trying to show the VRBO documents were inaccurate or incomplete, or to show Ms. Hutton may have rented to other guests that did not use the on-line rental sites. Nonetheless, Ms. Hutton testified to the inaccuracy of the Marriott reports, as did Mr. Weber, Marriott's Owner Services Manager.

[¶28] The Estate questioned Ms. Hutton about tax returns from the on-line rental services. Ms. Hutton testified that she never received any tax returns from those sites. When asked who received those, Ms. Hutton replied that Mr. Dykes's assistant, who set up the on-line rental accounts, did. Ms. Hutton further replied to questioning that she did not know where the tax returns go and that she had provided her personal tax return and 1099s. Christopher Dykes, co-representative for the Estate, testified that Mr. Dykes's 1099s and tax returns probably went to their office, but that he did not see anything that said VRBO or similar services. However, he qualified that testimony:

> A: His tax returns probably went to our office, but I don't—I've never seen anything that said VRBO or anything on it. **Granted, I don't dig through those. I got enough of my own and other companies**. **I don't think we would have gotten them**. **Our accountant may have**.

(emphasis added).

[¶29] The Estate did not have any other documents or evidence to prove the requested documents existed. The Estate's counsel conceded they did not try to subpoena the requested discovery documents from any other parties, such as VRBO, AirBnb, or Marriott. It relied on the evidence it presented and the Mariott records it submitted to assert Ms. Hutton had documents she had not turned over.

[¶30] At the end of the evidence, the Estate did not renew its motion for Rule 37 sanctions and the district court's order does not expressly rule on the motion. In its order following trial, the district court found there is no strictly enforced protocol for placing a reservation at the Marriott, that it is rather a dynamic process. It found that condominium owners may contact Marriott's reservation team through a variety of ways, including phone, email, or "walk-in" reservation by approaching the front desk. The district court similarly found

Marriott's reservation team generally sends out some form of confirmation, but again, there is no standard method used. As will be discussed in Issue 2 below, the district court made a finding that the Marriott occupancy lists were inaccurate and not credible. The district court also found that all the guests listed on Ms. Hutton's VRBO document are accounted for on Marriott's occupancy list. Furthermore, the district court found evidence established that guests stayed under different names than those used for their initial reservation, rental payments were received on varying dates, and the Marriott had a documented history of record-keeping errors.

[¶31] The findings the court made detailed above, encompass a reasonable basis to deny the requested Rule 37 sanctions. The Estate did not show that Ms. Hutton violated the district court's latest discovery order, that Ms. Hutton provided it with incomplete or inaccurate documents, or that any other documents were in Ms. Hutton's possession and not turned over. Overall, the record does not support that the Estate presented evidence sufficient to support its discovery violation argument. Although it would have been helpful for the district court to expressly rule, under these circumstances, we hold that the district court did not abuse its discretion when it declined to impose Rule 37 sanctions upon Ms. Hutton. The court could reasonably conclude as it implicitly did in its findings that sanctions were not warranted in this instance. *See Escobar-Salmeron v. Moyer*, 150 F.4th 360, 370 (4th Cir. 2025); *Tollet v. City of Kemah*, 285 F.3d 357, 369 (5th Cir. 2002) (holding although the court did not explicitly deny a motion, the entry of its final judgment was an implicit denial of any outstanding motions).

## ISSUE 2

**Did the district court clearly err in finding the Estate failed to prove Ms. Hutton improperly withheld condo rental payments?**

### STANDARD OF REVIEW

[¶32] "After a bench trial, we review the district court's factual findings for clear error and its conclusions of law de novo." *Hutton*, ¶ 16, 575 P.3d at 341 (quoting *Tilden v. Jackson*, 2025 WY 57, ¶ 18, 568 P.3d 1197, 1203 (Wyo. 2025)). The district court's findings "may not be set aside because we would have reached a different result." *Id.*, ¶ 17, 575 P.3d at 341 (quoting *Sorum v. Sikorski*, 2024 WY 124, ¶ 10, 559 P.3d 153, 160 (Wyo. 2024)). We do not substitute ourselves for the trial court as the fact finder. *Id.*; *see also Bunning v. Romero*, 2026 WY 40, ¶ 14, 587 P.3d 131, 136 (Wyo. 2026). In our review, "we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it[,]" and we defer to the district court's findings "unless they are unsupported by the record or erroneous as a matter of law." *Hutton*, ¶ 17, 575 P.3d at 341 (quoting *Sorum*, ¶ 10, 559 P.3d at 160); *see also Bunning*, ¶ 14, 587 P.3d at 136.

9

## DISCUSSION

[¶33] The credibility of witnesses, the weight of the evidence, and conflicts in the evidence must be resolved by the finder of fact. *McAdam v. McAdam*, 2014 WY 123, ¶ 26, 335 P.3d 466, 472 (Wyo. 2014) (citing *Olsen v. Olsen*, 2013 WY 115, ¶ 32, 310 P.3d 888, 895 (Wyo. 2013)); *see also Vlack v. Vlack*, 2024 WY 130, ¶ 52, 560 P.3d 268, 281 (Wyo. 2024). We give significant deference to the district court's firsthand assessment of witness testimony because the court is able to observe his or her demeanor during their testimony. *Matter of Est. of Soames*, 2022 WY 79, ¶ 16, 512 P.3d 629, 632 (Wyo. 2022); *Hoy v. Miller*, 2006 WY 147, ¶ 9, 146 P.3d 488, 491 (Wyo. 2006) ("[W]e do not have the benefit of how the trial judge sees and hears the witness—the pitch of the voice, facial changes, the movement in the witness—all of which may tell a separate story, to be given credence.").

[¶34] On appeal, the Estate argues the district court clearly erred in finding it had failed to prove its case. It contends that because Ms. Hutton provided only "secondary information," without identifying any "direct, primary source documentation" to dispute the Estate's Marriott records, the district court's reliance on Ms. Hutton's testimony and evidence was "logically flawed." The Estate provides no relevant legal authority for such a distinction of tiers or levels of evidence.

[¶35] The Estate also argues that the district court could not reasonably disregard the Marriott records entirely based on "a few unexplained discrepancies and speculation about 'internal errors.'" The Estate's claim is in direct contravention of our settled law that the district court resolves the credibility of witnesses, the weight of the evidence, and conflicts in the evidence. *See McAdam*, ¶ 26, 335 P.3d at 472; *Vlack*, ¶ 52, 560 P.3d at 281; *Olsen*, ¶ 32, 310 P.3d at 895. The Estate is essentially arguing that the district court clearly erred by finding the Marriott records were unreliable.

[¶36] We hold that, in our review of the entire record, and assuming the evidence of the prevailing party below—Ms. Hutton—is true and giving Ms. Hutton every reasonable inference that can fairly and reasonably be drawn from it, the district court did not clearly err in concluding the Estate had failed to prove its case, including the finding that the Marriott records were unreliable. *See Hutton*, ¶ 17, 575 P.3d at 341 (quoting *Sorum*, ¶ 10, 559 P.3d at 160). As we stated in the facts, the district court heard the sworn testimony of five witnesses, including Ms. Hutton, who was vigorously questioned by both parties, and received thirty-two exhibits into evidence.

[¶37] The record shows it was uncontroverted that Mr. Dykes's assistant set up the process whereby the on-line rental services accounts automatically directly deposited all rental payments into a Colorado bank account. Ms. Hutton provided the Colorado bank account documents to the Estate. Ms. Hutton also provided her personal relevant tax returns. These documents refuted the allegation that Ms. Hutton was hiding condo rental income that she had not reported.

10

[¶38] The Estate argued below, and now on appeal, that the Marriott records show Ms. Hutton rented the condo many times more than she has accounted for. The Estate contends Mr. Weber's testimony verifies the accuracy and dependability of the Marriott records. However, the district court disagreed and concluded differently. The record supports the district court's conclusions.

[¶39] As discussed in Issue 1, Ms. Hutton testified to the inaccuracy of the Marriott reports, as did Mr. Weber. The district court made a finding that the Marriott occupancy lists were inaccurate and not credible. The district court also found that all the guests listed on Ms. Hutton's VRBO document are accounted for on Marriott's occupancy list. Furthermore, the district court found the evidence established that guests stayed under different names than those used for their initial reservation, rental payments were received on varying dates, and the Marriott had a documented history of record-keeping errors. For instance, the Marriott maintains detailed occupancy lists, wherein paying guests are denoted by the code "AX" and "BX" denotes an owner or non-paying guest. There are instances where the lists incorrectly denote a non-paying guest as paying, and vice-versa.

[¶40] When shown one instance where Marriott's administration fee document showed no charge for a guest and Marriott's occupancy list showed the same guest was a paying guest, Mr. Weber stated "It looks to me like the [Marriott's] front office did not accurately charge the account and make sure the admin fee is posted." However, in this instance, the guest was Mr. Dykes's sister and would not be a paying guest, so the mistake was made on Marriott's occupancy list, not its administrative fee list.

[¶41] The district court found that internal errors by Marriott are not uncommon. In a footnote, the district court stated, "The court will not address every actual or alleged error regarding the Marriott's occupancy list. Simply put, it is evident that there are mistakes within this list related to the condo, and this certainly impacts its reliability." The district court noted that Marriott's internal errors are so significant that the condominium owners and Marriott are embroiled in a $30 million lawsuit concerning the alleged overcharging and misallocation of certain fees, including administrative fees.

[¶42] When Mr. Weber was asked whether there are times when information on somebody's account is incorrect, he unequivocally said "yes." Mr. Weber testified that you cannot tell from the Marriott occupancy lists when a reservation was made by an owner, when the owner relayed the reservation to the Marriott, the manner in which it was relayed—phone, email, in-person—and when payment would have been made to the owner. Mr. Weber also testified there is no way of telling whether a guest stayed for the entire time attributed to them on the list, and no way of knowing how much a guest paid or even if they paid. Ms. Hutton testified that reservations can be made and paid more than a year in advance.

11

[¶43] Mr. Weber also testified that Marriott's administrative fee records and other billing records are not always accurate, which was part of the multi-million-dollar lawsuit between the owners and Marriott. Mr. Weber testified to numerous specific examples of Marriott records errors related to the condo. For instance, Ms. Hutton's name appeared as a guest in Marriott's guest folio, also called the administrative fee report, and was erroneously charged fees. Another inaccuracy is that the condo is listed as a two-bedroom in the Marriott records, when in fact it is a three-bedroom condo. Mr. Weber also testified to the fact that some owners are sometimes charged fees for another owner's guest. Additionally, Mr. Weber testified that Marriott commonly adds the names of other guests staying in a unit to the guest folio so that they can make charges at the resort. However, those names added are not the person who made the reservation or paid for the unit, and this adds to the confusion of why there are more names on the guest folio compared to the occupancy report.

[¶44] Ms. Shtutman, a Marriott condominium owner, corroborated Marriott's records are inaccurate during her testimony. She testified that one reason for the condominium owners' suit against Marriott was its miscalculation of expenses, such as overcharging and excess charging.

[¶45] Ms. Hutton testified that, other than herself, her mother, Mr. Dykes's sister and her husband, and a friend from Texas, she knew none of the other guests listed as non-paying "BX" on Marriott's occupancy list. She testified that it was "clearly a mistake of the reservation desk." Ms. Hutton also testified that Marriott's occupancy list's date of reservation and the payment and actual stay did not all happen at the same time. For example, she demonstrated that one of the guests on Marriott's occupancy list made her reservation sometime prior to August 22, 2022, paid on August 22, 2022, but did not actually stay at the condo until more than a year later in December 2023. Ms. Hutton further testified to the charging errors made by Marriott, as discussed above.

[¶46] Considering this evidence, the district court concluded that the Estate failed to prove Ms. Hutton received and misused rental income rightfully belonging to the Estate.

> While there are undeniable inconsistencies in the rental receipts and reservations, the reason behind these discrepancies is wholly unclear. What is clear is that there is no proof of Ms. Hutton misusing funds from a rental that should have gone to the Estate. Instead, there was evidence that people stayed under different names than those used for their initial reservation, payments were received on varying dates, and the Marriot [sic] had a documented history of record-keeping errors. To the extent Ms. Hutton cannot account for all reservations, there is still—as the court noted above— no proof of funds bestowed upon Ms. Hutton. Thus, there is no proof that Ms. Hutton concealed, embezzled, smuggled, conveyed away, or disposed of monies, goods, or chattels. Mere suspicions are insufficient and, based upon

the credible witness testimony, no such reasonable inference can be made. Rather, the reasonable inference to be made is that the condo was not easy to rent, the Marriott process documenting rentals was cumbersome and imprecise, and the rental value of the condo was not what the Plaintiffs allege.

The record supports this conclusion.

[¶47]  It is clear from the record that Marriott's records—its reservations and charging records—lack sufficient detail and contain enough errors, mistakes, and inconsistencies that the district court acted reasonably when it found those records to be unreliable.  The district court was in the best position to assess the credibility of the witnesses, the weight of the evidence, and conflicts in the evidence, and we will not disturb those assessments. The district court did not clearly err in concluding Marriott's records were inaccurate and unreliable.  It, therefore, did not err in denying the Estate's claims.

## CONCLUSION

[¶48]  Affirmed.